Filed 6/5/13  In re J.J. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re J. J., et al., Persons Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CHRISTINA V., <br><br> Defendant and Appellant. | A135836, A136450 <br><br> (Contra Costa County Super. Ct. Nos. J11-00563, J11-00564, J11-00565) |
| In re CHRISTINA V., <br><br> on Habeas Corpus. | A137988 |

In these dependency cases, Christina V. (Mother) appeals from an order denying her petition pursuant to Welfare and Institutions Code section 388[1] for continued reunification services (A135836), and she appeals (A136450) and petitions for a writ of habeas corpus (A137988) following denial of another section 388 petition seeking to extend her reunification services, and entry of orders terminating her parental rights to her sons J.J. and C.V., and her daughter J.V.  We have granted Mother's requests to consolidate her appeals and to consolidate the habeas petition for consideration with

---

[1] Subsequent statutory references are to the Welfare and Institutions Code.

1

them, and we hereby grant her request to take judicial notice of the records in the appeals in the habeas corpus case.

In her appeals, Mother contends that the court erred when it denied her section 388 petitions without evidentiary hearings, and that her parental rights should not have been terminated because continuing the parent child relationship was in her children's best interests. (§ 366.26, subd. (c)(1)(B)(i)). In her habeas petition, she argues that the order terminating her parental rights must be reversed due to ineffective assistance of counsel. The issues are well argued on Mother's behalf but do not raise close questions for reversal. We affirm the orders denying the section 388 petitions and terminating parental rights, and we deny the petition for habeas corpus.

## I. APPEAL NOS. A135836, A136450

### A. Background

Mother gave birth to J.J., her oldest child, when she was 17. J.J. was seven, J.V. was four, and C.V. was two when these dependency proceedings were instituted in April 2011. The petitions alleged that the children were at risk of harm due to Mother's anger management problem. (§ 300, subd. (b).) She admitted the allegation, and the children were adjudged dependents.

According to the Bureau's jurisdictional and dispositional reports, the children's maternal great grandmother and a maternal great aunt were granted temporary guardianship of them in January 2010, and Mother reported that the children had been living with the great grandparents since the previous September.[2] The great aunt said that she and the great grandparents had raised Mother's children on and off since birth due to Mother's instability.

The great aunt said that family members feared Mother's unpredictable rages. The incident that precipitated these dependency proceedings occurred on March 3, 2011,

---

[2] These relatives are sometimes referred to in the record as "grandparents" or "aunt," but those designations appear to refer to their relationship with Mother, not the children. The jurisdictional report stated that the children's grandmother was living in Houston.

2

when Mother threatened the great grandmother with a knife in the presence of the children, and threw barstools around the great grandparents' house. Mother was on probation at the time following an incident in 2008 when she tried to run a man over while driving with her children in the car. In another 2008 incident, she repeatedly rammed her car into the car of a relative, who declined to press charges.

Mother denied "current and historical drug and alcohol use," but had been arrested in August 2009 for disorderly conduct and public intoxication after she tried to start a fight at a party. Mother claimed to have a bachelor's degree in psychology, but she had only a part time low wage job at McDonalds, and her family reported that she did not complete high school.

The great aunt said that Mother had not sought mental health treatment because "there is nothing wrong with her . . . there is something wrong with everyone else." Mother's probation officer reported that she "struggles with accepting or recognizing her negative behaviors," and "has a pattern of placing the blame on others." The social worker recommended that Mother obtain a psychological evaluation, and advised her to call "Mental Health access for mental health referrals." Mother's case plan required her to "complete a Mental Health Assessment arranged through Contra Costa County Mental Health or other Mental Health provider approved by the social worker; to sign necessary releases of information regarding previous Mental Health treatment; and to follow all recommendations resulting from that assessment."

The children were placed together in foster care at a confidential location, and Mother was granted one hour of supervised visitation with them twice a month.

Mother in pro. per. filed section 388 petitions seeking increased visitation with each of the children. The petitions were summarily denied on the ground that requisite notice had not been given.

The Bureau's report for the October 31 six-month review hearing stated that Mother had visited consistently with the children, but it was "unclear if [she] has addressed her mental health and anger problems. During this review period, [she] has demonstrated her ability to anger quickly and on two occasions was asked to leave the

3

interview room because her anger was escalating." She had "yell[ed]" and "cuss[ed]" at the social worker and a Bureau receptionist.

The Bureau's report also said Mother claimed to have obtained a psychological evaluation as required by the case plan, but she provided no confirming documentation. The social worker could not substantiate Mother's claim that she was seeing a therapist. It was "imperative that [she] provide the Bureau with documentation from her mental health therapist and a current psychological evaluation prior to the children beginning unsupervised visits." The Bureau had "not received verification that . . . she has followed the recommendation from St. Helena Hospital following her discharge in April 2011 . . . that [she] follow up with Contra Costa Mental Health. She was prescribed Depakote, which is prescribed to address symptoms of bi-polar, epilepsy and migraines. She was also prescribed Risperdal and Cogentin. Risperdal is an antipsychotic drug." Mother stated both that she was taking medication prescribed by a psychiatrist, and that she had never taken any such medication.

At the October 31 hearing, the court said that it was not inclined to follow the Bureau's recommendation that Mother be provided an additional six months of services, because it "[did not] understand what progress has been made." The Bureau said that Mother had not completed a mental health assessment, and such an assessment could not be made if there were "drug issues." Mother said that she had given the requisite documentation to the social worker. The court said that it would continue the hearing for four weeks if Mother would submit to a drug test and the test was negative. Mother agreed to the test, the result was negative, and the matter was continued with the understanding that the Bureau would file a supplemental report before the next hearing on December 2.

On November 14, Mother filed a declaration attaching documents related to her case plan. One of the documents showed her enrolled in parenting classes at Merritt College as of November 3. A September progress report from a marriage and family therapist at the Touchstone child abuse treatment program stated that Mother had attended 22 sessions since enrolling on January 11. A progress report from the Anger

4

Management Institute stated that she had attended 10 of the 52 sessions ordered. A November letter from a program coordinator at Bay Area Women Against Rape stated that Mother had 12 weekly personal counseling sessions with him from July 1 to September 16, and that her attendance was "impeccable." Since then, she had called him every other week to discuss "what has come up for her." During the counseling sessions, they had discussed "her prior drug and alcohol usage and how in the past she drank to stuff the feelings that came about as a result of her sexual abuse." Mother attached an August notice from the Social Security Administration denying her claim for SSI payments based on her professed depression and bi-polar and anxiety disorders. The notice stated that the decision was made based on reports from MDSI Physician Group, St. Helena Hospital, and CO/M Contra Costa Pittsburg. In handwritten notes, Mother described the Social Security notice as a "psychological evaluation," and stated that she had an appointment for another mental health evaluation on November 15.

The Bureau submitted a November 28 memorandum that acknowledged receipt of most of the foregoing documents, but clarified that Mother had not provided verification that she was meeting with a psychiatrist or had scheduled a psychological evaluation. Mother's supervised visitation with the children continued. The visits sometimes appeared stressful for her, and she had made a couple of inappropriate comments to the children. She usually brought candy and soda to the interviews, which "contribut[ed] to [the children's] excitement," and had been asked to refrain from doing so.

In January 2012, Mother in pro. per. filed section 388 petitions asking that the children be placed with her mother. The petitions were summarily denied on the grounds that they presented no new evidence and requested a change that would not be in the children's best interests.

After several continuances, the 12-month review was scheduled for February 27, 2012. On February 15, the court filed an "unreported minute order" changing the date of the review from February 27 to February 22. The proof of service for the order showed that it was sent to Mother's counsel, but not to Mother.

5

The Bureau's February 17 memorandum for the 12-month review recommended termination of reunification services and setting a section 366.26 (§ .26) hearing "due to [Mother's] limited participation in meeting her Case Plan responsibilities." Mother had not obtained a psychological evaluation, but said that she had one scheduled in May. Family members said they had tried to help Mother get counseling for her violent behavior, but "she has not been receptive." The memorandum stated: "The requirement for a psychological evaluation is a major component [of Mother's] Court-ordered Case Plan. The Bureau is aware that [Mother] has attended anger management classes in the past but is unable to benefit from the courses. [Mother] is an intelligent, young woman and according to the counselor at the Anger Management Institute, she was a good student. There is concern that [Mother's] inability to react differently to anger could be organic [and] without further testing there is no way to know."

The memorandum reported that Mother had submitted a certificate of completion of an anger management program, but the program was in Texas in 2007. Mother told the social worker that she wanted to give up her parental rights and have the children placed with their grandmother, but the grandmother said that she was unable to care for the children, and sent a letter "expressing her concerns regarding [Mother's] ability to care for her children's well-being." Mother reported that she had moved to Houston and wanted the dependency cases transferred to Texas.

The 12-month review was continued from February 22 to March 19. Mother did not appear at the March 19 hearing. Mother's counsel said that Mother had moved to Texas because she could not afford to live in California, and that Mother objected to termination of services, but there was no evidence to present on her behalf. Counsel for the Bureau said that Mother had not visited the children since her move, and the Bureau did not have her current address. The court terminated services and set a .26 hearing for July 10.

On June 13 and June 29, Mother filed section 388 petitions, detailed below, listing a local address in Pittsburgh and requesting further reunification services. The petitions were summarily denied on the ground that the proposed change would not be in the

6

children's best interests. Mother appealed from the order denying her June 13 petition in appeal No. A135836.

The Bureau's report for the .26 hearing stated that the children remained placed together with a maternal aunt and uncle, who planned to adopt them. Mother knew the identity, but not the location, of the prospective parents. The children "display[ed] a secure attachment" to them, and the Bureau believed that the children were adoptable. The oldest child, J.J., was less "animated and active" than his siblings and could likely benefit from further psychotherapy, and C.V., the other son, had previously qualified for speech services, but the children were all physically healthy and "developmentally on target." The report recommended termination of Mother's parental rights, and permanent plans of adoption.

J.J. was "clearly more severely affected" by Mother's behavior than his siblings. J.J. "does not speak of her throughout the month, he does not seek her affection during visitation, and he often presents as guarded and withdrawn in her presence." C.V., "being only 3 years old and having lived half his life outside the care of [Mother], seems more interested in the playroom toys during visitation than in interacting with [Mother]— unless she directly engages him in play." Mother "interact[ed] more intimately and affectionately" with her daughter, J.V., than with her sons during visits. J.V. was the only child to ask Mother about the possibility of living with her again. The Bureau "acknowledge[d] that there is a relationship between [Mother] and [J.V.]; however, [J.V.] is an impressionable girl of 5 years old who gets her nails painted and new clothes every time [Mother] visits." While the Bureau found it "difficult to measure the quality of [Mother's] existing relationship [with the children] given the extensive history of inconsistent and hazardous parenting," it believed that "the benefits of adoption, safety, security, and consistent nurturing for the children far outweigh[ed] the level of relationship that the children and [Mother] currently share."

The Bureau observed that when reunification services were terminated in March, Mother "was barely engaged in case plan requirements, nor had she addressed the most pressing concern regarding her stability—the requirement for a psychological evaluation

7

and possible follow-up care. [Mother] has stated many times that she had an appointment for psychological testing/evaluation; however, she had never produced a report or documentation to prove that she is participating in or has completed this requirement. Given the history of her reported behaviors of bizarre tendencies and multiple police reports regarding violent episodes, it has been suspected that [Mother's] challenges may have an organic base." Mother's denials of drug and alcohol use were called into question not only because of her 2009 arrest for public intoxication, but also due to a positive test for marijuana in April 2011, after the dependency proceeding were instituted, at the Center for Behavioral Health in St. Helena when she was placed on a section 5150 hold. The Bureau "continue[d] to have grave concerns about her ability to provide safe and stable parenting for the children."

Mother did not appear at the .26 hearing on July 10. One of J.J.'s alleged fathers, F.R., appeared for the first time in the case, and the hearing was continued to August 22. Mother appeared, but F.R. did not, at the August 22 hearing.

Mother testified that the children had been with her since birth, that they wanted to be with her, and that termination of her parental rights would not be in their best interests. On cross-examination, she acknowledged that guardianships for the children had been established before the dependency proceedings were instituted, but she said the guardianships were based on false allegations about what occurred at her house.

Mother said that she had obtained three psychological evaluations, and that she had a report from Social Security in her backpack. She produced the August 2011 notice denying her Social Security benefits, which she had lodged with the court along with her November 14 declaration. She said she had just completed another psychological evaluation with the Pittsburg Health Clinic, and produced a slip for an August 20 appointment with Dr. Khan at East Contra Costa County Adult Mental Health Service in Pittsburg. She said that she could not get a copy of the recent report because it had to be requested by the County or a doctor, and she needed "a special paper" to obtain it for the court. She said that she had been seen in April by Dr. Khan, who told her that, in order to

8

get a copy of the evaluation report, the County would need to submit paperwork and she would need to sign an authorization form.

In arguing for termination of Mother's parental rights, the Bureau emphasized her failure to obtain a psychological evaluation. Bureau counsel argued: "[I]t's never been produced because, in fact, it's never happened. [¶] . . . [¶] If in fact an evaluation exists, her attorney could have subpoenaed it. . . . [¶] . . . [¶] . . . That was really the key part of her plan, and the key issue that might have made it possible for at some point to get the treatment that she needed and possibly unify with her children, but it just hasn't happened." Mother's counsel argued that the children would benefit from a continued parental relationship with Mother. Counsel for the Bureau and the children disagreed. Bureau counsel submitted that the parent-child relationships in this case were not "the type of relationship a mother would have to have for the Court not to terminate parental rights." The children's counsel "d[i]d not believe that there is a sufficient parent/child relationship here that should outweigh what is in the best interests of these three children, and that is permanence and stability."

The court found that terminating Mother's parental rights was "clearly in the best interest of the children." The court stated that when the .26 hearing was set, the "pivotal issue was whether or not mother had obtained the psychological evaluation as required by her case plan." If Mother had obtained such an evaluation, her counsel "would have subpoenaed those records and ensured the production of a report that would have been demonstrative of a significant part of the case plan. [¶] . . . [T]he Court has concluded that [Mother] was not being forthcoming with the Court, either that or, at worse, [she] is laboring under some kind of mental issue that the Court is unable and not qualified to identify, in the sense that she is imagining things that have in fact occurred when the evidence is to the contrary."

Mother appealed from the order terminating parental rights in appeal No. A136450.

**B. Discussion**

(1) *Summary Denials of the Section 388 Petitions*

9

Mother contends that the court should have held evidentiary hearings on her June 2012 section 388 petitions. A parent who seeks to modify a previous order pursuant to section 388 must " 'make a prima facie showing to trigger the right to proceed by way of a full hearing. [Citations.]' [Citations.] There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children. [Citation.] If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing. [Citation.] We review the juvenile court's summary denial of a section 388 petition for abuse of discretion." (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250 (*Anthony W.*).)

        (a) <u>June 13 Petitions</u>

Mother's June 13 petitions sought to modify the orders of March 19, which terminated reunification services and set the .26 hearing. The petitions requested further reunification services, and were signed by Mother rather than her counsel, but counsel apparently participated in their preparation because the changed circumstances state: "My client was not aware of the court date and has completed all the services that were recommended by [the] social services agency for the reunification of her children before March of 2012." These allegations were too conclusory to warrant a hearing. (See *Anthony W.*, *supra*, 87 Cal.App.4th at p. 250 [petition cannot be conclusory; specific allegations are required]; *id.* at p. 251 [parent claimed to have completed reunification program but submitted no supporting evidence].) Mother made no attempt to explain or excuse her ignorance of the hearing date and, like the parent in *Anthony W.*, filed no documents evidencing fulfillment of her case plan. Mother also failed to make a prima facie showing that continued efforts at reunification would be in the children's best interests. The petitions simply stated, "[t]he child belongs with their mother." The court did not abuse its discretion when it declined to hold a hearing on the June 13 petitions.

        (b) <u>June 29 Petitions</u>

10

The court also acted reasonably when it denied a hearing on Mother's June 29 petitions for additional services.[3] These petitions, signed by Mother's attorney, claimed changed circumstances because: "Client has completed her case plan and the psychological evaluation required by the department. Client has maintained contact with department and her children. Client continues to maintain a stable home environment." The petitions asserted additional services would be in the children's interest because: "The children have a strong bond with their mother. The children would continue to have contact with their birth family and each other. The children have been cared for solely by Mother prior to a petition being filed by CFS."

The petitions did not establish a prima facie case of either changed circumstances or the children's best interests. They alleged that Mother had completed her case plan and obtained the requisite psychological evaluation, but were not supported with any proof. The petitions stated that Mother and the children had a "strong bond," without elaboration. Moreover, the petitions included false statements. Mother claimed that she had maintained contact with the Bureau, but the court learned at the March 19 hearing that she had moved to Texas and the Bureau did not have her current address. Mother claimed that she was the children's sole caretaker before the dependency petitions were filed, but she told the social worker at the outset of the proceedings that the children had been living with their great grandparents for the last seven months. The court was well within its discretion in declining to hold a hearing on the June 29 petitions.

(2) *Termination of Parental Rights*

Mother argues the court should have found that her parental relationship with the children was sufficiently beneficial to overcome the preference for a permanent plan of adoption. (§ 366.26, subd. (c)(1)(B)(i); *In re Casey D.* (1999) 70 Cal.App.4th 38, 50 [adoption is the preferred plan if the child is adoptable].) Regular visitation with the children is a prerequisite to the application of this beneficial relationship exception.

_____

[3] The rulings on these petitions are reviewable in appeal No. A136450 from the order terminating parental rights because they were made within 60 days of the filing of the notice of appeal. (*In re Madison W.* (2006) 141 Cal.App.4th 1447, 1449.)

11

(§ 366.26, subd. (c)(1)(B)(i); *In re Zeth S.* (2003) 31 Cal.4th 396, 412, fn. 9.) Mother claims it cannot be disputed that she satisfied this requirement because the .26 report stated that she visited with the children on a regular basis throughout the dependencies. However, the report also stated that she was only "able to attend some visitation" while living in Texas between January and April 2012. Nonetheless, we will assume that Mother fulfilled the visitation requirement, and address other facets of the beneficial relationship exception.

A beneficial relationship is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) A parent claiming the beneficial relationship exception bears a "heavy" burden of proving by a preponderance of the evidence that the exception applies. (*In re C.F.* (2011) 193 Cal.App.4th 549, 558; *In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295.) "[T]he parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) Rulings on the beneficial relationship exception are reviewed for substantial evidence. (See *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53.)

Here, as in *In re Casey D., supra*, 70 Cal.App.4th at p. 53, the social worker provided substantial evidence to reject the beneficial relationship exception. Relevant factors include "the portion of the child's life spent in the parent's custody," and "the positive or negative effect of interaction between the parent and the child." (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 467.) J.J. had spent most of his life in Mother's custody, but, according to the social worker's .26 report, he also appeared to be the child most damaged by her parenting, and he did not seek her affection during visits. (See *In re Zachary G.* (1999) 77 Cal.App.4th 799, 811 [beneficial relationship did not exist where, among other things, the child did not turn to the parent for affection and did not mind when visits ended].) C.V. was in Mother's custody for only the first half of his young life, and appeared more interested in playing with his toys than interacting with Mother.

Mother had the strongest bond with her daughter J.V., but to establish the beneficial relationship exception, "parents must do more than demonstrate 'frequent and loving contact' [citation], an emotional bond with the child, or that the parents and child find their visits pleasant.  [Citation.]  Rather, the parents must show that they occupy 'a parental role' in the child's life."  (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108-1109; see also *In re Derek W.* (1999) 73 Cal.App.4th 823, 827 ["pleasant and emotionally significant" relationship is insufficient].)

Mother left the children in their great grandparents' custody before they were adjudged wards, and over the course of the dependencies did not progress beyond supervised visitation.  The evidence did not demonstrate that she played the requisite parental role in their lives, or that her relationships with any of them were sufficiently beneficial to justify denying them of the benefits of adoption.

In addition, there is no merit to Mother's contention that the court failed to consider the beneficial relationship exception at the .26 hearing.  The parties all argued the issue.  Mother's counsel maintained that the children would benefit from continuing the parental relationship, while counsel for the Bureau and the children argued that the quality of that relationship did not justify denying the children permanence and stability.  There is no reason for us to conclude that the court ignored these arguments.

Although most of the court's comments concerned Mother's failure to obtain a psychological evaluation, its final remarks focused on the best interests of the children: "[I]t is clear to the Court that [terminating parental rights] is in the interest of the three children, who are not getting any younger, that it is time for their lives to be finalized, despite the fact that the mother is incapable of finalizing the issues in her life.  [¶] I'm mindful of the fact that time, especially as far as children of this tender age is concerned, moves on rapidly, and there is no reason for their youth to be put on hold while the mother attempts to organize her own life. [¶] Based on this and the fact that it is clearly in the best interest of the children, the Court is going to adopt [the Bureau's] [r]ecommendations . . . ."  Thus, the record does not substantiate Mother's claim that the

court "did not consider the harm to the minors that would result from severing the parental-child relationship they had with [her]."

## II.  PETITION FOR HABEAS CORPUS (A137988)

Mother argues in her petition for habeas corpus that her counsel's "failures to investigate [her] case, to properly support the section 388 petition by providing documentary evidence, and to adequately prepare for the 366.26 hearing by subpoenaing [her] psychological assessments demonstrates that [counsel] failed to provide adequate representation . . . ."

### A.  Record

Mother's habeas petition is accompanied by her declaration that, after the .26 hearing, she went directly to Contra Costa Health Services to ask how to obtain the reports of the psychological assessments she had received there.  She filled out disclosure authorizations and obtained copies of a April 28, 2011 "Adult Clinical Assessment" and a June 25, 2012 "Initial Psychiatric Assessment," which are attached to her habeas corpus petition.   Mother declares:  "Both my attorney and the social worker were aware that I had completed the psychological and psychiatric assessments.  To this day, I do not understand why the social worker or my own attorney did not obtain these assessments on my behalf."

The April 2011 report stated that Mother said she had been "5150ed" on April 14, 2011, because "neighbors made a false statement against her."  Mother said that her children "were all taken from her by CPS for unknown reason[s]."  The report noted "needs med management," and listed the dosages of various medications Mother was taking.

The June 2012 report stated that Mother said she was involuntarily hospitalized in 2011 "due to other people were watching her from [a] tunnel & she has evidence to prove this."  The notes describe Mother as "resistant/guarded about illness," and "vague" about "past hx."  Mother said that she did not need the psychotropic medications she had been given in the hospital, and she "declined to be started on any meds."  Under "Additional Info" the report said that Mother had finished two years of college.

14

In response to Mother's petition, the County filed declarations from social workers in the dependencies stating that the April 2011 and June 2012 assessments were not those required by her case plan. The social worker assigned to Mother's cases during the reunification period declares that she "repeatedly requested that [Mother] obtain a psychological evaluation at the direction of the Bureau. I explained to her that this evaluation would consist of a series of tests and interviews which would help evaluate her mental health and help explain why she had a history of violent outbursts. It was also explained that the evaluation would likely make recommendations as to a treatment plan for her." According to her best information and belief, the assessments Mother obtained were "as follow up to her involuntary hospitalization pursuant to . . . section 5150. . . . Neither appears to deal with her violent outbursts and how to deal with them." The social worker on the cases following the termination of services declares that she contacted the clinic that prepared the assessments and "was informed that they reflected regularly scheduled medication evaluations. The initial medical evaluation was in April 2011. [Mother] missed other scheduled appointments in May and July, 2011 and August 20, 2012 and then attended an August 31 appointment . . . ."

## B. Analysis

Indigent parents whose children are the subject of dependency proceedings and are placed out of the home have a right to competent appointed counsel. (*In re Paul W.* (2007) 151 Cal.App.4th 37, 66 [conc. opn. of Bamattre-Manoukian, A.P.J.].) Ineffective assistance of counsel can be asserted as grounds for reversal in a habeas corpus petition filed while a timely appeal from an adverse order is pending. (*Id.* at p. 68; *In re Carrie M.* (2001) 90 Cal.App.4th 530, 533-534.) "The habeas corpus petitioner bears a 'heavy burden' to plead facts sufficient to warrant relief." (*In re Paul W., supra,* at p. 69.) The "petitioner must show that 'counsel failed to act in a manner to be expected of reasonably competent attorneys practicing in the field of juvenile dependency law' and must also 'establish that the claimed error was prejudicial.' [Citation.] The test for prejudice is whether it is ' "reasonably probable" ' that a more favorable result would have occurred in the absence of counsel's alleged failings. [Citations.]" (*Id.* at p. 66.) "A court need

15

not evaluate whether counsel's performance was deficient before examining prejudice . . . ." (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1180.)

For many reasons, there is no reasonable probability that Mother would have succeeded on the section 388 petition filed by her counsel, or avoided termination of her parental rights if the psychiatric reports had been brought to light. It is not apparent that either psychological assessment was the kind the Bureau was seeking that would involve psychological testing and formulation of a treatment plan. And the reports did not paint Mother in a favorable light. The 2011 report reinforced the critical descriptions of her as someone who blamed others for her problems. She told the clinician that her involuntary commitment resulted from false accusations, and that she lost custody of her children for "unknown reasons," as if she were in no way responsible. The 2012 report has her saying that she was committed because people were watching her from a tunnel, thus suggesting that she might be delusional, and she appeared neither forthcoming about her history nor amenable to treatment.

The Bureau's opposition to Mother's petition points out that the reports harmed rather than helped her case. In response, Mother argues that the problem with the failure to produce the reports was that it undermined her credibility at the. 26 hearing. But, the court had multiple reasons to doubt Mother's credibility apart from what transpired at the .26 hearing. She claimed to have raised and nurtured the children from their births, which was untrue. She claimed no alcohol abuse or drug use, which was untrue. She claimed to have a college degree, which was also not true.

Further, by the time of the .26 hearing, Mother's credibility and compliance with her case plan were not central issues. "The focus of a dependency ultimately shifts to the child's interest in permanency, and any evaluation of the parent's rights [to competent counsel] in the later stages of the proceedings must take into account that the purpose and objective of the dependency law is to achieve a safe and permanent home for the child." (*In re Paul W., supra,* 151 Cal.App.4th at p. 68.) The focus at the .26 hearing was on the children and their long-term interests, not on Mother and her interest in reunification. Thus, it is highly unlikely that production of the psychological reports appended to

16

Mother's declaration would have thwarted the permanent plans of adoption the court ordered.

We note finally that, apart from her failure to obtain a satisfactory psychological evaluation, Mother's efforts to retain her parental rights were not exemplary. Before her reunification services were terminated,[4] she moved to Texas and told the Bureau that she wanted to give up her parental rights. She did not attend the originally scheduled, July 10 termination hearing, and avoided the consequences of such a glaring dereliction only because an alleged father appeared and precipitated a continuance to August 22.[5]

For all of these reasons, we see no prospect that presentation of the psychological assessments at the .26 hearing, or in the section 388 petition on the eve of that hearing, would have changed any outcome.

---

[4] Mother's appellate briefs and habeas petition are sprinkled with complaints about the lack of services she received. However, when the court ordered termination of services and the setting of the .26 hearing it found that reasonable services had been offered. Mother did not file a writ petition challenging that order, and cannot do so now that the order is final. (*In re Janee J.* (1999) 74 Cal.App.4th 198, 206-209.)

[5] At the end the July 10 hearing, when Mother's counsel asked that the social worker be ordered back on August 22, the court said, "We would like to have your client here, too," and counsel replied, "Not as much as me."

## III.  DISPOSITIONS

The orders denying the section 388 petitions and terminating parental rights are affirmed.  The petition for habeas corpus is denied.

_____
Siggins, J.

We concur:

_____
McGuiness, P.J.

_____
Jenkins, J.